IVEY *v.* STATE

No. 42505          February 11, 1963          149 So. 2d 520

*L. A. Gily, Jr., Harold W. Melvin,* Laurel, for appellant.

*G. Garland Lyell, Jr., Asst. Atty. Gen.,* Jackson, for appellee.

LEE, P. J.

Jimmie Lee Ivey was jointly indicted with Arlene Ivey, his wife, for the murder of Doc Porter. A severance was granted and he was tried first. The jury found him guilty and fixed his punishment at life imprisonment in the State Penitentiary. From a judgment, in accordance with the verdict, he appealed.

The State showed that Catherine Wallace witnessed a difficulty between the Iveys and Doc Porter in her front yard. At first she and Arlene were on the porch. The men were standing in the yard under a chinaberry tree engaged in an argument. Arlene walked out to where the men were, and Jimmie, with a knife already open in his hand, handed it to her as she stood behind him, and told her to "kill the black son of a b. . . .". She reached over her husband's shoulder and stabbed Porter. This version was corroborated by Chree Williams, who was standing on the porch, and who also said that Porter had nothing whatever in his hands and did nothing to the Iveys.

The evidence disclosed that there was a stab wound in the left shoulder between the collarbone and the heart, and that Porter died shortly. after the stabbing.

The State also offered in evidence an alleged free and voluntary statement of the defendant, over his objection, in which he had said that there had been an argument between him, Arlene and Doc Porter, and that he handed Arlene the knife and told her to "stab the black son of a b. . . .", and that the knife was his.

Two witnesses for the defendant testified that they saw Porter with a knife. Another said that he saw Porter with an open knife and that he was fixing to cut Ivey. This witness admitted, on cross-examination, that he had been convicted of burglary.

The defendant took the stand and denied that the bloody knife, which the officers found under Porter's body, was his. His attorney asked him only four questions, and the State did not cross-examine him.

The only action of the court which has been assigned as error is that the statement of the defendant, made to the officers shortly after the killing, was not free and voluntary, and, for that reason, its admission constituted reversible error.

The contention was that the officers had with them a large white German Shepherd dog named "Snowball" which they used to force the statement. The court conducted a preliminary hearing as to the voluntariness of the confession in the absence of the jury. The defendant testified that the officer said "If you don't tell me the truth about this thing I am going to put you in the room and turn Snowball a loose." Several questions later, his counsel asked "Did they use this dog to make you talk?", and he answered, "Well, I was ready to talk, I was about drunk then and was talking then, trying to tell them like it was." On cross-examination he was asked "Jimmie Lee, did the dog scare you?", and he replied, "Well, when he barked he scared me." He was asked "Did you make a statement to them after that time?", and he replied, "The words that they 'axed' me was 'tell the truth about it', and the words I told them was I was telling the truth the best I knowed how. Well I didn't said nothing else then."

All of the officers testified that the defendant made a free and voluntary statement. They said that they apprised him that any statement, which he made, could be used against him; that he was threatened in no way; and that no inducements, promises, or hope of reward were held out to him. They testified that there were no threats to use the dog against him whatever. The evidence disclosed, in effect, that Kent Shoemake, the owner of Snowball who took the dog with him nearly all

of the time, and another officer, Tony Parker, were out in the car in discharge of their duties; that they had Snowball with them when they received the call to make an investigation on Meridian Avenue, the scene of the killing; that they went to this place, found the dead body of Porter, and made an investigation; that when they went to the courthouse and the questions were being asked of the defendant, Shoemake was standing in the door and he had the dog on a leash on the outside in the hallway; that various policemen, unaware of the questioning by the officers in the room and who were prone to "pick at" the dog, would come by, make motions as if to draw a gun or jump at the dog, and that he would bark or growl or jump at them also until his master bade him lie down; that the dog at no time barked or jumped at the defendant; that there were no threats that the dog would be used to harm the defendant; and that these acts of the dog were in no way intended to coerce or intimidate the defendant into making any incriminatory statement.

At the close of the evidence on the preliminary hearing, the trial judge overruled the objection and held the statement to be admissible.

Under one answer of the defendant, he was ready to tell the officers about the matter before anything was said about the dog. Besides he seemed to be afraid of the dog only when he barked. He did not claim that the dog barked at him. In Pinter v. State, 203 Miss. 344, 34 So. 2d 723, this Court held that a fellow prisoner's prediction that Pinter would be taken to Jackson and put in a death cell, and a conversation between two deputies, heard by him, about the supposed revelations of a lie detector, did not constitute undue influence where he approved the confession as read to him. In Richardson v. State, 242 Miss. 701, 133 So. 2d 266, the court overruled the claim of involuntariness of the confession because of fear generated from his having spent the

night before in a cell which had been known as the "death cell" many years before when hanging was the mode of execution. See also Nicholson v. State, 235 Miss. 273, 108 So. 2d 842, where appellant was left alone in jail all night.

The officers emphatically denied that they threatened to use the dog on the defendant to coerce him into making the statement. When there is an issue as to voluntariness, obviously the court must determine the truth of the matter. (Hn 1) If the evidence is conflicting on the question of voluntariness, this Court will not disturb the trial court's finding unless it appears to be contrary to the evidence. Ellis v. State, 65 Miss. 44, 3 So. 188; Brown v. State, 142 Miss. 335, 107 So. 373; Stubbs v. State, 148 Miss. 764, 114 So. 827; Buckler v. State, 171 Miss. 353, 157 So. 353; Wohner v. State, 175 Miss. 428, 167 So. 622; Cooper v. State, 194 Miss. 592, 11 So. 2d 207; Parker v. State, 194 Miss. 895, 13 So. 2d 620; Clark v. State, 209 Miss. 586, 48 So. 2d 127; Jones v. State, 209 Miss. 896, 48 So. 2d 591.

In Wohner v. State, supra, the opinion said: "It is not the rule, and we assume it never will be the rule, that the mere fact that a defendant produces testimony tending to prove that his confessions were coerced renders them incompetent, although the evidence on the point is conflicting. In such cases the trial court must determine the issue presented by the conflicting evidence, and, where its decision is fully supported by the evidence, it will not be reversed."

In Moore v. State, 207 Miss. 140, 41 So. 2d 368, in pointing out the absurdity of a situation if appellate courts must accept the uncorroborated statements of defendants rather than leave the issue on disputed facts for the determination of the trial judge, the opinion said: "If the decision of a trial judge upon a preliminary inquiry into the voluntary character of a confession, and the subsequent finding of the jury in that

behalf, where such decision of the judge and finding of the jury are made on conflicting evidence and are supported by the overwhelming weight thereof, are to no longer be of any force and effect, then an accused will only need to commit his crime while alone with his victim, make a free and voluntary disclosure of his guilt to the officers and others, and then make the *claim*, for the benefit of the record on appeal, that his confession was coerced. If the appellate courts in order to comply with due process of law must adopt the theory that they should accept the uncorroborated statement of a calloused criminal as being a 'thus saith the Lord,' and to thereupon overturn the decision of the triers of fact as to the voluntariness of a confession, then the decisions of such courts in that regard will have become inimical to the maintenance of law and order.''

(Hn 2) The evidence in this case was overwhelming to the effect that the statement, made by the appellant, was free and voluntary, and, if human testimony is to be believed, the threat of putting him in a room and turning Snowball loose on him was simply a myth.

It therefore follows that the judgment of the circuit court must be, and is, affirmed.

Affirmed.

*Kyle, Arrington, Ethridge and Rodgers, JJ.,* concur.