361 So.2d 1360 (1978)
John Buford IRVING, III
v.
STATE of Mississippi.
No. 50250.
Supreme Court of Mississippi.
August 2, 1978.
Rehearing Denied September 13, 1978.
*1362 Leonard McClellan, Lewis Myers, Jr., Oxford, for appellant.
A.F. Summer, Atty. Gen., by Catherine Walker Underwood, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
LEE, Justice, for the Court:
John Buford Irving, III was indicted for capital murder in the Circuit Court of Pontotoc County. He was given a bifurcated trial following the guidelines set forth in Jackson v. State, 337 So.2d 1242 (Miss. 1976). After hearing evidence pertaining to the guilt phase, the jury returned a verdict of guilty as charged. The same jury heard evidence on the sentence phase and unanimously found that the mitigating circumstances did not outweigh the aggravating circumstances, and that appellant should suffer the death penalty. The trial court sentenced him to death.
Gambrell Ray and his wife, Mrs. Opaline Ray, operated a rural grocery store. Their living quarters were housed within the store building. About 8 p.m. on March 3, 1976, they had closed the store and were eating supper in the kitchen when they heard a knock at the store door. Mr. Ray went to the door, and Mrs. Ray heard appellant say, "Mr. Gambrell, I want a pack of cigarettes." As soon as the door opened, Mrs. Ray heard a gunshot. She picked up a loaded pistol, went to investigate, and saw appellant standing in the doorway with a shotgun. Her husband's body was lying on the floor close to appellant. Mrs. Ray had known appellant for many years and had seen him in the store earlier that day. She yelled at appellant to get out and fired the pistol at him. He crawled under a store counter, and she fired again, eventually discharging all cartridges. Mrs. Ray decided to leave the store with appellant still under the counter, and when she went into another room, she heard the front door slam and a car leave hurriedly. She tried to use the telephone, but it was inoperable; she then locked the front door after determining that her husband was dead, and went to the nearby home of her daughter where the sheriff and ambulance service were called.
Mississippi State Highway Patrolman William Eubank received a call directing him to the Ray's country store for the purpose of investigating the homicide. He arrived about 8:15, saw where the store door had been kicked in, found Mr. Ray lying dead on the floor in front of the wooden door, and observed bloody footprints on the inside of the building. A cash box and a double barrel 20-gauge shotgun, both owned by the deceased, were missing.
About 6:30 a.m. the day after the shooting, Essie Pruitt, a friend and neighbor of the Irving family, was approached by appellant, who asked permission to stay at her home. He went into the storage room where she kept her washing machine. Mrs. Pruitt called the sheriff, who immediately came to her home, arrested appellant and took him to jail. Mrs. Pruitt later found a sock full of change in the storage room when she was washing clothes. The double barrel 20-gauge and single barrel shotguns were discovered in a water barrel behind the Tom Franklin barn, approximately two hundred (200) yards from the Ray store.
Sheriff Hubbard testified that appellant told him he stepped inside the store, Mr. *1363 Ray went behind the counter to get the cigarettes, and appellant said, "This is a stickup" and that Ray said, "You're not going to get a damn thing." Appellant said that Mr. Ray stepped toward him and he shot Ray, that after Mrs. Ray left, he (appellant) came back, kicked open the door and got the change box and 20-gauge shotgun.

I.

The scope of appellate review is broad in capital cases.
We recognize that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed. Augustine v. State, 201 Miss. 731, 29 So.2d 454 (1947). What may be harmless error in a case with less at stake becomes reversible error when the penalty is death. Forrest v. State, 335 So.2d 900 (Miss. 1976); Russell v. State, 185 Miss. 464, 189 So. 90 (1939). Therefore, we have given careful scrutiny to the proceedings in the trial below in order to determine whether accused received a fair trial and without necessary regard to whether technical basis for preserving error was made by counsel.

II.

Refusal of the trial court to permit defense counsel to withdraw because of conflicting interest.
Appellant was arrested on March 4, 1976, and attorney Lewis Myers, Jr. was retained by him March 8, 1976. On the same date, Myers was retained by Keith Givhan, an accomplice. Appellant and Givhan were indicted for capital murder in separate indictments on July 7, 1976. Appellant entered a plea of not guilty August 2, 1976, pretrial motions were filed August 31, and September 1, 1976 by Myers and his associate, attorney Leonard McClellan.
On November 8, 1976, the day before the case was set for trial, with a special venire of one hundred (100) persons having been summoned, Myers filed a motion to withdraw as counsel claiming a conflict of interest between Irving and Givhan. The trial judge held a hearing on the motion outside the presence of the jury on November 9, 1976, to determine the merits of same. The substance of the motion and a statement made by Attorney Myers was that each defendant gave inculpatory statements about the other, that Irving and Givhan had been talking with several ministers, which resulted in their conversions, that they had been born again, and "It became difficult for me as counsel in attempting to construct a defense, in attempting to give advice to my client because of certain notions, because of certain ideas that he had, allegedly based on this conversion."
Appellant relies upon Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426, decided by the United States Supreme Court April 3, 1978.
In Glasser, the Government tried five codefendants jointly for conspiracy to defraud the United States. Two of the defendants, Glasser and Kretske, were represented initially by separate counsel. On the second day of trial, Kretske became dissatisfied with his attorney and dismissed him. The district judge asked Glasser's attorney, Stewart, if he would also represent Kretske. Stewart responded by noting a possible conflict of interest, his representation of both Glasser and Kretske might lead the jury to link the two men together. Glasser made known to the court that he objected to the proposal. Nevertheless, the court appointed Stewart to represent Kretske, although he continued as Glasser's retained counsel. The record disclosed that Stewart failed to cross-examine a government witness whose testimony linked Glasser with the conspiracy and failed to object to the admission of arguably inadmissible evidence. Such failure was viewed by the court as a result of Stewart's desire to protect Kretske's interest and was indicative of Stewart's struggle to "serve two masters." The court said:
"The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising *1364 from its denial. Cf. Snyder v. Massachusetts, 291 U.S. 97, 116, 54 S.Ct. 330, 336, 78 L.Ed. 674; Tumey v. Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749; Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854. And see McCandless v. United States, 298 U.S. 342, 347, 56 S.Ct. 764, 766, 80 L.Ed. 1205. Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting, that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court. In conspiracy cases, where the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant, it is especially important that he be given the benefit of the undivided assistance of his counsel without the court's becoming a party to encumbering that assistance. Here the court was advised of the possibility that conflicting interest might arise which would diminish Stewart's usefulness to Glasser. Nevertheless Stewart was appointed as Kretske's counsel. Our examination of the record leads to the conclusion that Stewart's representation of Glasser was not as effective as it might have been if the appointment had not been made. We hold that the court thereby denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment. This error requires that the verdict be set aside and a new trial ordered as to Glasser." 315 U.S. at 76, 62 S.Ct. at 467, 86 L.Ed. at 702.
In Holloway, three individuals were indicted jointly on July 29, 1975, on counts of robbery and rape occurring June 1, 1975, in Little Rock, Arkansas. On August 5, the trial court appointed Harold Hall, a public defender to represent all three defendants. They were arraigned and entered pleas of not guilty. Two days later, their cases were set for a consolidated trial to commence September 4. On August 13, Hall moved the court to appoint separate counsel for each petitioner because the defendants had stated to him that there was a possibility of a conflict of interest in each of their cases. After conducting a hearing on this motion and on motions for severance, the Court declined to appoint separate counsel. On September 4, before the jury was impaneled, Hall renewed the motion for appointment of separate counsel on the ground that one or two of the defendants may testify and, if they did, then he would not be able to cross-examine them because he had received confidential information from them. The motion was denied again. On the second day of trial, after the prosecution had rested its case, attorney Hall advised the court that, against his recommendation, all three defendants had decided to testify. He then stated to the court that the conflict which he had brought to the court's attention before trial was beginning to materialize. Two of the defendants testified without guidance of counsel and without examination by counsel. In reversing the convictions, the United States Supreme Court stated:
"Here trial counsel, by the pretrial motions of August 13 and September 4 and by his accompanying representations, made as an officer of the court, focused explicitly on the probable risk of a conflict of interests. The judge then failed either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel. We hold that the failure, in the face of the representations made by counsel weeks before trial and again before the jury was empaneled, deprived petitioners of the guarantee of `assistance of counsel.'
* * * * * *
The State argues, however, that to credit Hall's representations to the trial court would be tantamount to transferring to defense counsel the authority of the trial judge to rule on the existence or risk of a conflict and to appoint separate counsel. In the State's view, the ultimate *1365 decision on those matters must remain with the trial judge; otherwise unscrupulous defense attorneys might abuse their `authority,' presumably for purposes of delay or obstruction of the orderly conduct of the trial.
The State has an obvious interest in avoiding such abuses. But our holding does not undermine that interest. When an untimely motion for separate counsel is made for dilatory purposes, our holding does not impair the trial court's ability to deal with counsel who resort to such tactics. Cf. United States v. Dardi, 330 F.2d 316 (CA 2), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); People v. Kroeger, 61 Cal.2d 236, 37 Cal. Rptr. 593, 390 P.2d 369 (1964). Nor does our holding preclude a trial court from exploring the adequacy of the basis of defense counsel's representations regarding a conflict of interests without improperly requiring disclosure of the confidential communications of the client. See State v. Davis, supra [110 Ariz. 29, 514 P.2d 1025]. In this case the trial court simply failed to take adequate steps in response to the repeated motions, objections and representations made to it, and no prospect of dilatory practices was present to justify that failure." 435 U.S. at 486-487, 98 S.Ct. at 1178-1180.
In Lugo v. United States, 350 F.2d 858 (9th Cir.1965), the Court stated:
"It is true that where one attorney represents two codefendants, a conflict of interest which denies one or both of the defendants the effective assistance of counsel is a distinct possibility. When such a conflict exists, the conviction cannot stand. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). On the other hand, absent a conflict of interest which interferes with the proper presentation of the defense of one of the codefendants, the mere fact that both are represented by the same attorney is not grounds for reversal. Gonzales v. United States, 314 F.2d 750 (9th Cir. 1963). There has been no showing of any conflict of interest between Lugo and Santiago in this case, nor have we found any in our review of the record. Also, nothing indicates that Rock failed to give Lugo's defense the attention it required.
All the cases cited to us by appellant involved obvious conflicts of interest, and while we cannot indulge in nice calculations about the amount of prejudice which results from a conflict of interest [Glasser, supra], neither can we create a conflict of interest out of mere conjecture as to what might have been shown.
Regarding the allegation that a continuance should have been granted the day before trial, it suffices to point out that appellant was represented in fact by Attorney Rock in all preliminary matters as well as at trial, so Rock was undoubtedly familiar with appellant's case, that appellant entered the same defense used by his codefendant, and that there was no objection to the dual representation and no request for a continuance at any time." 350 F.2d at 859-860.
See also Gonzales v. United States, 314 F.2d 750 (9th Cir.1963).
At the hearing on the motion in the present case, while appellant's attorney desired to be relieved of defending Irving, he expressed a willingness to proceed with the defense of Givhan, whose case was set for trial the following week. Neither appellant nor Givhan testified. Counsel relied wholly upon the weakness of the State's case and upon evidence other than their testimony. The record does not indicate that Attorney Myers would have defended any differently or would have approached the defense of the case on another basis had he not been representing Givhan. The record does not reflect any prejudice or harm resulting to appellant on account of the alleged conflict of interest. After a thorough hearing on the motion, the trial judge found that there was no conflict of interest and we cannot disagree with that conclusion. The fact that appellant made it difficult for his attorney to construct a defense and to advise with him because of "notions" acquired, based on his being converted, does not bring this case within the Glasser rule.

*1366 III.

Introduction in Evidence of Photographs of Deceased.
The State offered and the court admitted in evidence three (3) black and white photographs of the deceased's body lying in the store building. Appellant contends that the photographs had no evidentiary value, they are gruesome and were introduced solely for the purpose of prejudicing and inflaming the jury. It is further suggested that, even though such photographs may be properly admitted in a case of less gravity than a capital case, in this case, gruesome pictures should be held prejudicial, inadmissible, and reversible error simply because of the finality of the punishment.
The trial court has wide discretion in determining whether photographs are sufficiently material and relevant to justify their admission in evidence. In Mallette v. State, 349 So.2d 546 (Miss. 1977), eight (8) color photographs of the nude body of a female, who had been beaten to death with a 2 X 4 and which were horrible and gruesome, were held to be properly admitted because they had evidentiary value in showing the cruelty by which the woman was killed and in depicting marks which indicated she had been beaten with a 2 X 4.
Although testimony in the present case related to the position of the body, the photographs corroborated and explained that testimony and corroborated and explained testimony of the physician with reference to the entrance and exit points of the shotgun load. They also had relevancy to the distance appellant was from his victim when he fired the gun [Mrs. Ray testified that, as soon as appellant asked for cigarettes, the gun fired, while appellant stated that Ray went behind the counter to get the cigarettes, that he then demanded Ray's money, Ray advanced toward him and he shot Ray at that time].
We are of the opinion that the trial judge did not abuse his discretion in admitting the photographs in evidence.

IV.

The judicially-constructed capital sentencing system and the Eighth Amendment to the United States Constitution.
Appellant contends that only the Legislature may provide the procedures in capital sentencing, that the procedures announced by this Court in Jackson v. State, 337 So.2d 1242 (Miss. 1976) [See U.S. Supreme Court cases cited], may not be constitutionally enforced, and he urges that we overrule Jackson. In Jackson, the guidelines for a capital case were stated as follows:
"We now hold that a trial in which the defendant is subject to receiving the penalty of death must be conducted in two phases:
The first phase shall deal only with the question of guilt or innocence of the accused or either the capital crime with which he is charged, or if warranted by the evidence, a lesser included offense. The first phase of the trial relating to guilt or innocence shall be conducted in all respects in the same manner that other criminal trials are now conducted.
If the jury at the first phase of the trial finds the defendant guilty of the capital offense with which he is charged, the trial court shall immediately, if practical, conduct a separate sentencing hearing before the same jury. However, if this should be impossible for some reason now unforeseeable, the sentencing hearing may be conducted before another jury.
At the sentencing hearing, the question to be decided by the jury is whether the defendant shall be sentenced to death or to life imprisonment. At this hearing, the State may elect to stand on the case made at the first hearing, if before the same jury, or may reintroduce any part of the evidence adduced at the first hearing which it considers to be relevant to the particular question of whether the defendant shall suffer death or be sentenced to life imprisonment. In addition thereto, an accused's prior record of criminal convictions, if any, may be proven as *1367 an additional aggravating circumstance whether the defendant testifies in his own behalf or not. At this hearing, the defendant may prove his lack of a prior criminal record as a mitigating circumstance and may also adduce proof of any other circumstance or combination of circumstances surrounding his life and character or the commission of the offense with with he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life in prison.

Proof beyond a reasonable doubt of the statutory elements of the capital offense with which the accused is charged shall constitute sufficient circumstance to authorize imposition of the penalty of death unless the mitigating circumstances shown by the evidence outweigh the aggravating circumstances.
The jury shall not be required to make a special finding of any mitigating circumstance in order to return a verdict that the accused should be sentenced to life in prison. However, before the jury may return a verdict that the defendant should suffer the penalty of death, they must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death.
If the jury is unable to agree unanimously on a verdict at the sentencing hearing, the defendant shall be sentenced to life in prison.
We also hold that all convictions of persons where the penalty of death is imposed will be reviewed by this Court as preference cases in such a manner as to see that the death penalty was warranted under the facts of the case and that death sentences will not be wantonly or freakishly imposed but will only be inflicted in a consistent and evenhanded manner under like or similar circumstances.

We hold that Mississippi's death penalty statute is constitutional as construed and implemented by this opinion and that it satisfies the concerns expressed in Furman and the other recent cases." (Emphasis added) 337 So.2d at 1256.
The United States Supreme Court held the Ohio death penalty statute to be violative of the Eighth and Fourteenth Amendments and unconstitutional in Lockett v. Ohio, ___ U.S. ___, 98 S.Ct. 2954, 57 L.Ed.2d 973, decided July 3, 1978, and said:
"We are now faced with those questions and we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." At ____, 98 S.Ct. at 2965.
and
"The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." (Emphasis added) at ____, 98 S.Ct. at 2967.
In contrast with the Ohio procedure, we said in Jackson, supra,[1] that the defendant *1368 "may also adduce proof of any other circumstances or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death, or be sentenced to life in prison." 337 So.2d at 1256. Thus, appellant here was unlimited in presenting proof of any circumstance which might have been beneficial to him, and he took advantage of that provision in Jackson and requested and received the following instructions:
"D 23
In considering mitigating circumstances the jury may consider whether the defendant is incorrigible, or not capable of reforming his conduct to the values and standards of the community and society."
"D 25
The defendant John Buford Irving, III, may adduce proof of any other circumstance or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life imprisonment."
We decline to overrule Jackson, which is a complete answer to this contention.
Appellant next argues that, in the event this Court declines to overrule Jackson and holds that those procedures may be constitutionally enforced, they should not be applicable to this case or to any crime that was committed prior to October 6, 1976 (date Jackson was decided), and that such an application would be violative of both the State and Federal prohibitions against ex post facto laws.
In Bell v. State, 353 So.2d 1141 (Miss. 1978), decided November 9, 1977, after submission of appellant's brief here, the question was answered when this Court held that, in such case, appellant is not subjected to an ex post facto violation. Also, see Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

V.

Denial of Appellant's Motion for Mistrial Based on Statement by Victim's Sister, who had been Summoned to Serve on Special Venire.
After members of the special venire had been assembled in the courtroom, a juror (Mrs. Wiley Boland) stated to the court, "Judge, the murdered man is my brother." The trial judge promptly excused the juror. When the defendant had completed his voir dire examination, he moved the court for a mistrial or to quash the venire on the ground that the venire could have been tainted by such comment.
The court, the district attorney and appellant's attorney conducted voir dire examinations of prospective jurors and all members of the panel, who were retained, stated that they could and would be fair and impartial in the trial of the case. The record reflects that the court, the State and the appellant made reference to the term "murder" and instructions incorporated therein the word "murder." Appellant consumed forty-one (41) pages of the record in examining the prospective jurors on voir dire and there is nothing in the record to indicate that any member of the panel or the jury was tainted by the juror's remark. There is no merit in this assignment. Dalton v. Madison, 216 Miss. 35, 61 So.2d 688 (1952).

VI.

The Test of Exclusion Used by the Trial Court Compared to the Minimum Standards for Death Qualification Required by the Constitution of the United States as Construed in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In Witherspoon, the United States Supreme Court held:
"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed *1369 conscientious or religious scruples against its infliction." 391 U.S. at 521-522, 88 S.Ct. at 1776-1777, 20 L.Ed.2d at 784-785.
Following Witherspoon, this Court considered the procedure to be employed by trial judges in Myers v. State, 254 So.2d 891 (Miss. 1971). That procedure follows:
"`The proper method of bringing the death penalty to the attention of the special veniremen is for the trial judge to inform them that they have been summoned as veniremen in a capital case and that a verdict of guilty could result in the infliction of the death penalty. The judge should then ask them if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say that they are opposed to the death penalty, the trial judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released. The mere fact that a venireman is opposed to the death penalty does not disqualify him as a juryman, if he can do his duty as a citizen and juror and follow the instructions of the court, and where he is convinced of the defendant's guilt he can convict him although the verdict of the jury may result in the death penalty's being inflicted upon the defendant.' (Emphasis added). Armstrong v. State, Miss., 214 So.2d 589, at 593." 254 So.2d at 893-894.
Almost the identical procedure was approved by the United States Supreme Court in the recent case of Lockett v. Ohio, supra. The trial judge in the present case followed the Myers guidelines in detail. He excused a juror for cause only when that juror stated that he could not or would not follow the law and the evidence. We are of the opinion that there was no violation of appellant's constitutional rights or the principles of Witherspoon in the selection of the jury.

VII.

Denial of Appellant's Motion for Change of Venue.
Appellant filed a motion for change of venue on the ground that he could not obtain a fair and impartial trial by jury in Pontotoc County because of prejudice and ill will existing against him. The trial judge heard the motion and entered an order denying the change of venue, which order recited that the court heard testimony and argument of counsel and found that the defendant could obtain a fair and impartial trial by jury in that county. During voir dire of the jury, the trial judge asked whether any juror had received information from newspapers, radio or television coverage about the case which would influence his or her decision. All persons selected on the trial jury qualified as being without prejudice, bias or knowledge of the facts in the case. There is nothing in the record to indicate that appellant did not receive a fair and impartial trial, nor is there anything to show an abuse of discretion in denying the motion for change of venue. The assignment is without merit. Stevenson v. State, 325 So.2d 113 (Miss. 1975).

VIII.

Refusal of the Trial Court to Suppress Appellant's Confession.
Appellant made a confession to Sheriff Hubbard in the presence of the county attorney and the Pontotoc chief of police. He testified at the hearing on the motion to suppress the confession that he was threatened by the sheriff as well as another officer and that he repeated what the sheriff suggested about the homicide on March 3, *1370 1976, because he feared what might happen to him, if he refused. Appellant contends that under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the court committed error in not suppressing the confession.
Sheriff Hubbard testified that he advised appellant of his constitutional rights, that appellant was not threatened or coerced, and that the confession was freely and voluntarily given. His testimony was corroborated by the county attorney and chief of police who were the only other persons present. The trial court found from the evidence beyond a reasonable doubt that there were no threats or promises made to defendant and that he received full and adequate Miranda warnings. In such a situation, the trial court must determine the truth of the matter and this Court will not disturb those findings unless they appear to be contrary to the evidence. Burrill v. State, 328 So.2d 334 (Miss. 1976); Ivey v. State, 246 Miss. 117, 149 So.2d 520 (1963). The legal determination made by the trial court that appellant's confession was freely and voluntarily given is supported by the weight of credible evidence.

IX.

Appellate Review of Sentence.
Appellant contends that the procedure established by this Court in Jackson v. State, 337 So.2d 1242 (Miss. 1976) for appellate review of death sentences violates his right to due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States because he is denied notice and an opportunity to be heard upon the issue of whether his death sentence is excessive or disproportionate when compared to sentences imposed in similar cases. He further contends that this procedure allows review of an issue not decided by the trial court and to have a meaningful appeal he must be aware of standards and guidelines for review of death penalty sentences which have not been outlined by this Court.
The question of whether the aggravating circumstances outweigh the mitigating circumstances was an issue before the trial court and is the precise issue decided by the jury after the sentencing phase of the trial in accordance with Jackson v. State, supra. The accused had the right to adduce evidence of any mitigating circumstances at the trial and to present argument to the jury that the mitigating circumstances outweighed the aggravating circumstances, and, in exercising that right, appellant called to the stand in his behalf nine (9) witnesses.
In Jackson, we held that cases in which a sentence of death is imposed will be automatically reviewed as preference cases by this Court, that the record will be reviewed and compared with similar cases to determine whether the punishment of death is too great when the aggravating and mitigating circumstances are weighed against each other in order to assure that the death penalty will not be wantonly or freakishly imposed, but will only be inflicted in a consistent and evenhanded manner under like or similar circumstances. 337 So.2d at 1255-1256. It follows that an additional safeguard against capricious application of the death penalty on appeal to this Court only inures to the benefit of the appellant, and the argument made in support of this assignment is unsound.
Two cases have been decided by this Court since Jackson v. State. In Bell v. State, 360 So.2d 1206, 1978, Bell was convicted of murder-robbery and sentenced to death. He was seventeen (17) or eighteen (18) years of age. He participated in the robbery of a service station and in the subsequent slaying of the eighteen-year-old attendant with shotguns. In Washington v. State, Miss., 361 So.2d 61, No. 50,401, decided July 12, 1978, Washington was also convicted of robbery-murder and sentenced to death. He, along with an accomplice, robbed a convenience store in Columbus, Mississippi, and, during the robbery, he shot one of the proprietors in the stomach with a shotgun, fatally wounding him. Washington was twenty-three years of age, was *1371 unmarried, but had a three-year-old daughter, and had been convicted only of a marijuana crime.
In the present case, Irving was convicted of a robbery-murder and was sentenced to death. He shot the proprietor of the country store, whom he had known for many years, in the neck with a shotgun, at close range, while attempting the robbery. He was twenty (20) years of age and previously had been convicted of burglary.
We have carefully reviewed the record in the present case, and have compared it with the Bell and Washington cases and we conclude that the punishment of death is not too great when the aggravating and mitigating circumstances are weighed against each other and that the death penalty will not be wantonly or freakishly imposed here. We further conclude that the imposition of the death penalty in the present case is consistent and evenhanded in like and similar cases.

X.
The appellant, as his last assignment, noted seven (7) errors, which he neither briefed nor argued, as follows:

(A) The Failure of the Trial Court to Exclude from the Courtroom the County Attorney who was a Material Witness for the State.

The county attorney testified for the State on introduction of appellant's confession. The sequestration rule is a procedural matter within the discretion of the trial judge. Butler v. State, 320 So.2d 786 (Miss. 1975). In Gillespie v. State, 215 Miss. 380, 61 So.2d 150 (1952), the Court held that it was not error to allow a county attorney to testify as a witness after hearing testimony offered by other witnesses, since he was an officer of the court. There was no showing here that the trial court abused its discretion or that appellant was prejudiced thereby.

(B) The Failure to Exclude the Sheriff and Other Law Enforcement Officers from Assisting the Prosecution in Picking the Jury.

Appellant moved the court to prevent the sheriff and other law enforcement officials from helping choose the jury after voir dire and challenges for cause. There was no proof in support of the motion. In a similar situation in Smith v. State, 219 Miss. 741, 69 So.2d 837 (1954), the assignment was held to be without merit.

(C) The Failure to Excuse an Alternate Juror who was Making Comical Faces and Laughing During the Sentencing Hearing.

During the sentencing phase, appellant filed a motion to excuse the alternate juror because other people had informed him that the juror was making comical faces and laughing. Appellant did not support the allegations of the motion with proof. The trial judge overruled the motion, stating that he had not noticed any such behavior on the part of the alternate juror and that the juror had been sequestered alone in a jury room when the jury retired to deliberate on its verdict. (First phase). The court's action is presumed to be correct in the absence of proof. Gordon v. State, 349 So.2d 554 (Miss. 1977).

(D) The Trial Court's Sustaining the State's Objection to Defense Instruction No. 6 on the Testimony of Eyewitnesses.

Instruction No. D-6 told the jury to consider certain facts in weighing the testimony of an eyewitness. The only eyewitness was Mrs. Ray, the victim's wife. The court refused to grant the instruction as a comment on the weight of the evidence and properly so. Ragan v. State, 318 So.2d 879 (Miss. 1975).

(E) The Trial Court's Sustaining the State's Objection to Defense Instruction No. 22 on a Lesser-Included Offense.

Instruction No. D-22 would authorize the jury to find the lesser-included *1372 offense of murder rather than capital murder. It was refused as being unsupported by the evidence. Appellant contends there is proof to support an inference the killing was murder unconnected with armed robbery because the money was taken after Mr. Ray was shot. The undisputed evidence reflects that Ray was killed when appellant was attempting to commit the crime of armed robbery and the instruction was properly refused. See Jackson v. State, supra, which states that such an instruction should not be automatically or indiscriminately given.

(F) The Trial Court Erred in Overruling the Defendant's Objection to State's Instruction No. 14 which Allowed the Defendant's Prior Record to be Considered as an Additional Aggravating Circumstance.

Jackson v. State, supra, held that an accused's prior record of criminal conviction may be proved as an additional aggravating circumstance whether an accused testified in his own behalf or not. There is no merit in this assignment.

(G) The Trial Court's Refusal to Allow the Jury to Hear Testimony Regarding the Discriminatory Manner in which the Death Penalty is Administered.

Outside the presence of the jury, defense counsel was allowed to make a record of testimony by Rev. David A. Garcia which the court ruled inadmissible. Garcia testified about his finding on various studies concerning the effect and imposition of the death penalty, and that even after Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the death penalty is still applied cruelly and arbitrarily. Jackson v. State, supra, is authority sustaining the trial court's action, and this assignment is without merit.
There being no reversible errors in the record, and the appellant having received a fair trial, the case is affirmed and Friday, the eighth day of September, 1978 is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED AND FRIDAY, SEPTEMBER 8, 1978 IS SET FOR EXECUTION OF DEATH PENALTY.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, BOWLING and COFER, JJ., concur.
NOTES
[1] Jackson and Irving were tried prior to the enactment of Mississippi Code Annotated Section 99-19-101 (1972) as amended, (sentencing statute) effective April 13, 1977, which contains the general provision: "In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances." In addition, seven items of mitigating circumstances were enumerated. We held in Jackson v. State, 337 So.2d 1242 (Miss. 1976) that the Mississippi death penalty statute in effect prior to April 13, 1977, was constitutional as construed and implemented by that opinion and we also held in Washington v. State, Miss., 361 So.2d 61, No. 50,401, decided July 11, 1978, that Mississippi Code Annotated Section 99-19-101, as amended, is constitutional under the same construction and implementation.