COOPER *v.* STATE.

(Division B. Dec. 21, 1942.)

[11 So. (2d) 207. No. 34894.]

Hansford L. Simmons, of McComb, and **Willie M. Broome**, of Tylertown, for appellant.

Greek L. Rice, Attorney General, by R. O. Arrington, Assistant Attorney General, for appellee.

Argued orally by **Hansford L. Simmons**, for appellant, and by **R. O. Arrington**, for appellee.

**Alexander, J.,** delivered the opinion of the court.

Appellant was convicted of murder in the killing of his wife. The homicide occurred on August 10, 1941. The testimony from which the jury were warranted in reaching their verdict discloses that the appellant, early on the date stated, in his own home choked or strangled his wife to death and dragged her body out of the house through a fence and left it in a corn field, after having kicked or stamped upon her head. As a result of the latter abuses, a wound was left in her head and her jaw broken on both sides. There was evidence that the attack upon her was ruthless and accompanied with frenzied force. It is unnecessary further to elaborate the details of the crime.

Later in the day on which the crime was committed, the defendant stated, in offering to explain the absence of his wife whose body had not yet been found: ''Somebody have smothered Annette down with a sheet and toted her out of the house. There is prints of her fingers on the bed where she tried to hold on.'' It was further testified that when the father of the wife inquired as to her whereabouts, the defendant paled noticeably and refused to answer. This conduct led to suspicion and resulted in a a search for the body. During the search, it was suggested to several parties by the appellant that they need not search the corn field because he had searched it thoroughly and she was not there. Several witnesses disclosed that appellant had threatened to kill his wife if she left home and went to the home of her mother, and one of such threats was made by the defendant on the day of the homicide. In view of the fact that a complete written confession was made by appellant about two weeks later, it is appropriate further to recite some other incriminating circumstances which are relevant in considering the attack made upon the voluntary character

of this confession. On the morning after the killing, while appellant was in jail, he was accosted by a deputy sheriff of Lincoln County, who was then performing some of the duties of the jailer and who did not know the defendant nor on what charge he was confined, and who asked him what he was "doing in there." The appellant, after identifying the officer as such, replied, "I murdered my wife." On several occasions during the interval between his arrest and the date of his written confession seventeen days later, the defendant was interrogated in the sheriff's office and elsewhere about the crime. These interviews were conducted by officers, who, according to the testimony, invariably assured appellant that he need not make any statement unless he so desired and was warned that any such statement could be used against him. Appellant discussed with other inmates of the jail the nature of evidence in criminal cases and revealed some anxiety as to whether convictions could be allowed to stand on circumstantial evidence alone. He denied his guilt on several occasions. During the interval mentioned, the interrogation was not continuous but upon isolated occasions and would often be brought about by the discovery of some incriminating evidence which would be submitted to appellant for such explanation as he cared to make. Appellant in turn made suggestions to the officers that they investigate certain other parties and on one occasion when a third party was presented to him for questioning by the appellant himself, the latter finally stated, "Well the whole thing looks like it points to me." On August 27th, the defendant was taken to the court-house at Brookhaven, in an adjoining county, where he was questioned in the presence of Col. T. P. Brady, the Commissioner of Public Safety, Capt. Wilson and Lt. Richardson of the State Highway Patrol, the District Attorney, Mr. Barlow, and Sheriff Britt of Lincoln County. Sheriff Davis of Pike County was also present part of the time, having arrived after the confession had been made and transcribed. Upon his arrival, the defendant stated:

"Mr. Davis, I have decided to tell the truth about this thing." To which the sheriff replied: "Well, Luther Lee, I am glad you did. I have been interested in you and I felt like you would." Whereupon, the appellant disclosed to him the details of his written confession. After reading the confession, Mr. Davis asked him "Is this the way it was?", to which he replied "It is." He was then asked why did it, and replied, "Well, I was just mad." The confession itself is next in chronological order. It was on the occasion just mentioned, written down by the District Attorney at the dictation of appellant, who, upon reading the completed document, made several corrections therein and initialed such corrections as well as each page of the confession and signed same. The written confession is as follows:

"My name is Luther Cooper. I am 23 years of age. I am making this statement free and voluntary and of my own free will and I have been advised that I did not have to talk to any one and I have not been threatened or promised anything neither have I been abused by any one and no one has harmed me. But all have been good to me.

"On Saturday night August the 9th, 1941, in Pike County about one (here I said one and he corrected it to 6 and initialed that L. L. C.) six miles west of McComb on O'Neal's Dairy Farm where I lived with my wife Annette Dunaway Cooper age 20 years.

"About 12 o'clock Saturday night I was asleep on my back and my wife waked me pouring some 'Beechwood Creosote' toothache medicine (I left out 'in my mouth' and he corrected that and initialed it) and I jumped up and ran out on the front porch and spit it out and then went back in the house or started in the

"Luther Lee Cooper

"No. 2

house and my wife met me at the door with a 3 pronged ice (I first wrote pick and he corrected it to prog and he initialed it) and struck at me, and no light on and I

caught her by the throat with my left (I left out the word 'hand' and he caught that and inserted hand and initialed it there) hand and choked her and threw her on the bed trying to make her drop the Ice (pick) prog and when I turnded back around to her I saw that she had not moved. I saw that she was not moving and I tried to revive her or bring her to, and bathed her face, then I saw that she was dead and I picked her up in my arms and carried her to the wire fence behind the house and put her under the wire and then dragged her by her hands around the end of the corn rows and out in to the corn where she was found, and when I got her there I kicked her once and then stomped her. I was still mad is the reason that I did that. All this happened before I went to milk and after I had gone down and milked and went back to the house and then gave the alarm

"Luther Lee Cooper

"No. 3

and went down to Mr. Pearlie O'Neals, and then went over to Mr. Harry Hart's home and told them the same thing. That is, that Annette (my wife) was gone.

"We looked around for a while and then I got Mr. O'Neal to take me to my mother's and from there on out to my wife's father's and after we had come back home we looked for her again; but I knew all the time where she was and they found her about 3:30 P. M. Sunday, August 10th, 1941.

"And this statement is made by me of my own free will and accord and with (I left out the word 'out' and he corrected it and initialed it again) out any promise or any reward or any mistreatment to me by anyone.

"My wife weighed about 90 pounds and was about 5 ft. high (and he signed again on that page)

"'Luther Lee Cooper.'"

In passing upon the competency of the confession, which was admitted by the trial judge after prolonged qualifying testimony, it is well to consider other testimony in adjudging its voluntary character. On August

28th, appellant requested Sheriff Davis to bring his mother to the jail to see him. This was done the next day. Upon their meeting, she requested him to tell her about the matter and he proceeded to relate the details according to his prior confession. She was not called as a witness upon the trial. Upon being later questioned on the details of the confession, the appellant was asked: "There was no toothache medicine or ice prog in it, was there Luther?". In reply to the question, he answered, "No," and shook his head. Appellant, in answer to a question by a deputy sheriff, verified the fact that he had killed her because she had refused to comply with some demand of his. It was further testified by the officers who searched the house the morning of the homicide that no toothache medicine was found in the room and that the ice pick or prong was in its usual place.

While the assignment of error chiefly relied upon involves the competency of the confession, we will respond briefly to some of the other assignments. Upon the drawing of a special venire, boxes one, three and five were exhausted after only eight names had been drawn. The rest of the jurors were drawn from two and four, one of which covered the beat in which the crime was committed and the other an adjoining beat. This was not error. Simmons v. State, 109 Miss. 605, 68 So. 913. Nor was there error in refusing a new trial because of the alleged disqualification of the jurors Rock and Hughes. On the motion for a new trial based on facts alleged to have been unknown during the trial, both the defendant and his attorneys must make affidavit or testify under oath that they were ignorant of such facts during the trial. Hilbun v. State, 167 Miss. 725, 148 So. 365.

Instruction number four, refusal of which is alleged to have constituted error, is as follows: "The Court instructs the jury for the defendant that if any single juror does not believe that the state has proved the defendant guilty beyond all reasonable doubt, then it is the sworn duty of that juror to vote not guilty and to continue to

do so.'' It was clearly proper for the court to refuse this instruction, since it omits the necessary qualification that the judgment of the juror must be subjected to the reasoning and consultation of fellow jurors, and moreover compels adherence to opinion once it has been formed. Easter v. State, 191 Miss. 651, 4 So. (2d) 227, 137 A. L. R. 391; Cartee v. State, 162 Miss. 263, 139 So. 618.

Appellant contends that the verdict should not in any event be for a higher crime than manslaughter. It is sufficient to state in reply to this assignment that although the facts amply warrant a verdict of murder, both the defendant and the state received instructions authorizing the jury to designate the crime, if it be so found, as manslaughter. Other assignments are found to be without merit.

We do not find sufficient evidence of undue influence or any coercion which would deprive the defendant's confession of its voluntary character. We take occasion to state, however, that our affirmance of this case involves no approval or endorsement of the methods and procedure by which this testimony was procured. The confession in the instant case is found to have been properly submitted to the jury, and, being consistent with all physical facts and circumstances, is found worthy of acceptance by the trial jury. We do not think that counsel for appellant has followed an implausible course in directing his attack upon the confession as being the product of repeated questioning by officers of a defendant who had sought no other advisors than the inquisitors themselves. We do not, however, reject the confession in the instant case merely because it was procured under circumstances which in most cases are infected with abuse, threats and promises which compel an unwary defendant to become his own accuser.

The judgment will be affirmed, and the date of execution set for February 12, 1943.

Affirmed.