ANDERSON v. STATE.

(In Banc. April 8, 1946.)

[25 So. (2d) 474. No. 36055.]

Herbert Holmes and Dick R. Thomas, both of Senatobia, for appellant.

Greek L. Rice, Attorney General, by R. O. Arrington, Assistant Attorney General, for appellee.

Argued orally by **Dick R. Thomas**, for appellant, and by **R. O. Arrington**, for appellee.

**Roberds, J.,** delivered the opinion of the court.

Anderson was indicted for and convicted of the murder of Vera Evans, and sentenced to the state penitentiary for life, the jury disagreeing as to the punishment.

He assigns a number of errors, but the conclusion we have reached makes it necessary that we pass upon only three of them.

The principal witness for the state was Bessie May Evans, a negro girl, eleven years of age, the daughter of Clyde Evans, and step-daughter of Vera Evans, the second wife of Clyde Evans. Appellant contends that Bessie May Evans was not qualified to be a witness, and that without her testimony there was no evidence to convict appellant of any crime under the indictment. He says she did not have the capacity to understand questions and frame and express intelligent answers, nor

did she possess a sense of moral responsibility to speak the truth. Peters v. State, 106 Miss. 333, 63 So. 666; Jackson v. State, 158 Miss. 524, 130 So. 729. On her preliminary examination in the absence of the jury, when asked by the district attorney what happens to little girls who tell stories, she replied "They gets a switching." Again "Do you know where bad little children go when they die?" and she replied "To the devil." On cross-examination, she said she did everything her father told her to do and she would tell whatever her father told her to say; that her father had told her what to say in this case and she would tell that and stick to it, and that if she said what her father told her to say she thought she would be doing no wrong. The district attorney then examined her in detail as to the events of the homicide and she gave clear and intelligent answers; she explained where she went to school; said she could read and write; that she could multiply some but didn't know much about adding and subtracting. She then said she would tell the truth regardless what her father had told her to say. The learned trial judge then asked: "Is the testimony you are going to give here something your father told you, or what you yourself saw?" Answer: "What I Saw." "And you are going to tell that and that alone?" Answer: "Yes, sir." The court then permitted her to testify before the jury. The testimony she then gave shows she understood and grasped the questions asked her, and her answers were as clear and intelligent as is usual for one of her age, race and schooling. The only serious question about her capacity as a witness is her answer, made to a question asked by able counsel for appellant, that her father had told her what to say and she would say that regardless of the truth of it. Later, she said he had not told her what to say and that she was going to tell what she saw. We do not think this alone disqualified her as a witness. It would be interesting to know the percentage of children eleven years of age who would follow the lead of truth rather than the command of

father. This child was before the learned trial judge. He saw and observed her. He heard her words and noted her actions. He was in much better position than is this Court to say whether she was qualified as a witness. That was a question of fact, "the decision of which, in the language of Mr. Justice Brewer in Wheeler v. United States, 159 U. S. 523, 16 S. Ct. 93, 40 L. Ed. 244, 'rests primarily with the trial judge, who sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence, as well as his understanding of the obligations of an oath. As many of these matters cannot be photographed into the record, the decision of the trial judge will not be disturbed on review unless from that which is preserved it is clear that it was erroneous.'" The common sense of the ordinary juror is also a protection against error in this regard. They see and hear the child testify and are in position to evaluate the accuracy and weight of the testimony. It is usually more a question of credibility than of qualification. We cannot say the court erred in permitting her to testify.

Appellant further says no conviction can be had in this proceeding because the proof fails to show that the wound inflicted by him upon Vera Evans caused her death. We will summarize the evidence on that question. Anderson stabbed Vera Evans in the chest with the sharp point of a file. This instrument was about ten inches long, and tapered to a point at one end. It was the usual file used in this state for sharpening hoes. It was introduced in evidence and the jurors saw and examined it. The stabbing took place in a field where Vera was hoeing cotton in June 1945, at about 6 o'clock in the afternoon. When the wound was inflicted, she cried out and started from the scene across the field and fell face down when she had gone a short distance. She was unable to rise without aid. Blood was coming from the wound. She was carried to her home in a wagon. About midnight,

she was taken to Dr. W. D. Smith. He testified he found: ". . . a punctured wound at the junction of the second rib and the breast bone, in the center . . . It wasn't in the breast. It was the center of the chest . . . It went down to the bone. It didn't penetrate or fracture the bone''; that it was merely a flesh wound. He was asked whether that wound of itself would have caused her death. He replied: "Not the puncture. There was a blow behind that.'' Just what he meant by the last statement is not clear. He dressed the wound and told her husband to take her home; that he did not think the wound was serious or that there was any need for her to be brought back to him, and that her death was a surprise to him. Eva died around 8 o'clock the next morning at her home. Clyde Evans testified that after leaving the office of Dr. Smith she had great difficulty breathing; that she grew worse and became unconscious and was never again in condition "where she could talk right''; that she was bleeding profusely from the wound, and, as stated, died around 8 to 9 o'clock the next morning. He further said Vera was five to six months with child; that she was in good health and had worked regularly at manual labor in the fields during that year. There is no intimation that there was any cause for her death other than the wound inflicted by appellant. That question was specifically submitted to the jury by an instruction granted the defendant, and the jury found that the wound inflicted by appellant caused her death. We think there was ample evidence to sustain that finding.

Appellant next contends that the evidence in this case fails to show that he had any malice towards Vera Evans, but, if so, the uncontradicted testimony, both on behalf of the state and the defendant, is that this wound was inflicted during a mutual combat and fight between himself and Vera Evans, and in the heat of passion, and that, for these reasons, he should not have been convicted of a greater crime than manslaughter. The proof in this regard discloses that appellant and his wife and

Martha Newberry, and Martha's daughter, Sara Jane Newberry, were hoeing cotton in a field adjoining a field in which Vera Evans and her step-daughter Bessie May Evans and Tillie Woods, sister of Clyde Evans, were also hoeing cotton. Of these, only Martha, Sara Jane and Bessie May testified. They were placed on the stand by the state. Martha and Sara Jane testified in substance that the two groups were a short distance apart; that Vera was five to six months with child; that appellant asked Vera "What she got for that?" referring to her state of of pregnancy. Vera made no answer and appellant repeated the question, whereupon Vera asked if he were talking to her. Appellant again asked the question, and Vera replied, "I don't want to hear it." The parties continued at their work, no other words passing between them. Anderson was carrying in his hip pocket the file described above. He had it and was using it for the purpose of sharpening the hoes of his group of workers, a customary habit in this state under the circumstances. In about fifteen minutes, when appellant's group had reached the end of their rows, appellant told them he would go to the home of Mr. Sowell, under whom all of these parties were sharecroppers, and get the mail. Martha was asked: "Tell the jury what you saw Willie Anderson do when he started through the field towards where Vera was." Answer: "I didn't see him doing nothing. He was walking along, going on up towards the house. . . . He passed on by where they were working, going on"; that Anderson then came back towards Vera, and when he got back to where she was "they were having an argument"; that she could not hear what was being said; they were about four feet apart, and ". . . . it looked like they were waving their hands to each other," Vera had a hoe in her hand and "I saw her arise up the hoe like that"; that Anderson made a motion with his hands (demonstrating), and it looked like he reached for the hoe; "It looked like he ran under the hoe"; that Vera then started away and a short

distance away fell in the field. Anderson then came back into the field to his group. She said she could not hear the conversation between appellant and Vera. The quotations are from the testimony of Martha Newberry, but the testimony of Sara Jane was about the same in substance.

Bessie May Evans testified she was hoeing cotton beside her step-mother Vera Evans, and that Anderson "passed by me and put his hand on my head, this way, and kept on by her . . . "; that Vera said "Willie is gone to tell Man that I wouldn't talk to him"; that "Man" was the husband of Vera, Clyde Evans, and father of the witness; that Anderson said "I ain't going to where Man is. I am going to where Mr. Sowell is"; that Vera called Anderson a son-of-bitch, and "told him to get off the row, and she cussed him"; that Anderson told her not to cuss him any more. "If you do I will slap you", and she said if you slap me, I will put the "law" on you; that Anderson asked if she wanted to fight; that Anderson drew the file and Vera drew the hoe, and that Anderson stabbed her with the file, and Vera started across the field and Anderson left also. That was the testimony of the state.

One Hoyt Wallace, placed on the stand by the defendant, was plowing a short distance away from the parties. He said, "I didn't understand the words they were saying. They were in a row. I heard some cussing. I heard a woman's voice cussing, calling him every kind of a son-of-a-bitch. You black son-of-a-bitch, and everything like that, . . . I heard that fussing going on and I told my kid, that they were fixing to have a fight down there. About that time I looked up and Vera had a hoe drawn back, like that, like she struck, and he ran back. And when she drawed back again, he ran under and caught her." It is further shown that no enmity existed between these parties prior to this occasion. Clyde Evans testified appellant was friendly to his family. The testimony also is that Vera was a person of

very high temper; that she was of a very fussy nature, even her husband testifying that she would call him "All sorts of sons-of-bitches."

Section 2226, Code 1942, defines manslaughter as "The killing of another in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . ." Ordinarily, whether a homicide is murder or manslaughter is a question for the jury. Woodward v. State, 130 Miss. 611, 94 So. 717; Cooper v. State, 194 Miss. 592, 11 So. (2d) 207. However, there is no dispute in this case that this was a mutual fight and that the immediate cause thereof was the vile language directed by Vera Evans to appellant. If it can be said that his first inquiry to her was the act of an aggressor, it is undisputed that on his way to get the mail he had passed Vera and was going on his way; that nothing was said between them when he passed her, and that after he had gotten beyond her, she began the verbal encounter again; that she herself renewed the contest after he had abandoned it; that she had in her possession a hoe and drew it upon appellant. In other words, there is no question that this was a mutual fight and combat, and was immediately brought on by Vera herself. There seems no question the act of appellant was committed in the heat of passion. Whether appellant acted in self-defense and was justified in his actions were questions for the jury, but the undisputed proof discloses a situation where appellant could not be guilty of an offense greater than manslaughter.

Reversed and remanded.