532 So.2d 602 (1988)
George HARRIS
v.
STATE of Mississippi.
No. 56781.
Supreme Court of Mississippi.
October 12, 1988.
*603 Travis T. Vance, Jr., Eugene A. Perrier, Vicksburg, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
George Harris was indicted, tried and convicted in the Circuit Court of Warren County on a charge of murder and sentenced to life imprisonment in custody of the Mississippi Department of Corrections. He has appealed to this Court and assigns two (2) errors in the trial below.
ROY NOBLE LEE, Chief Justice, for the Court:

I.

THE LOWER COURT ERRED IN DECLINING TO DISMISS THE CHARGE OF MURDER AGAINST APPELLANT.
Under this assignment of error, appellant contends that the court erred (1) in denying his request for a directed verdict of not guilty and a peremptory instruction of not guilty, (2) in refusing to reduce the charge to manslaughter, and (3) in refusing to grant his motion for a new trial on the ground that the verdict of the jury was contrary to the overwhelming weight of the evidence. Appellant addresses Assignment I in two pages of his brief and cites two cases in support thereof, i.e., Edwards v. State, 469 So.2d 68 (Miss. 1985); and Cook v. State, 467 So.2d 203, 209 (Miss. 1985).
The two cases cited by appellant correctly state the law. He quotes the following paragraph from Edwards:
If the facts and inferences so considered point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, granting the motion is required. May v. State, 460 So.2d 778, 781 (Miss. 1984). On the other hand, if there is substantial evidence opposed to the motion  that is, evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense  the motion should be denied.
469 So.2d at 70.
Also, appellant cites Cook v. State, 467 So.2d 203 (Miss. 1985), which stated as follows:
Where a defendant has requested a peremptory instruction, the trial court must consider all of the evidence  not just the evidence which supports the State's case  in the light most favorable to the State. May v. State, 460 So.2d 778, 781 (Miss. 1984). The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Glass v. State, 278 So.2d 384, 386 (Miss. 1973).
467 So.2d at 208.
There are several versions as to what occurred prior to and at the time of the homicide. Neither the wisdom of Solomon nor the combined intellect of an appellate court could decide the issue of guilt. Only a jury from the county at large, after observing the demeanor of the witnesses, hearing the testimony, and considering all the evidence under proper instructions on the law from the trial judge, could resolve that issue. This is as it should be. An appellate court should not and cannot usurp the power of the fact-finder/jury where, as here, the evidence is so conflicting.
In Griffin v. State, 480 So.2d 1124 (Miss. 1985), and in cases previous and subsequent to Griffin, this Court stated the standard as follows:

Hammond v. State, 465 So.2d 1031 (Miss. 1985), stated the rule with reference to granting directed verdicts and peremptory instructions of not guilty in criminal and civil cases as follows:
The rule in regard to a peremptory instruction is the same in criminal and *604 civil cases, the rule being that when all the evidence on behalf of the State is taken as true, together with all sound reasonable inferences that may be drawn therefrom if there is enough to support a verdict of conviction, the peremptory instruction must be denied. 465 So.2d at 1035.
480 So.2d at 1126.
In Smith v. State, 463 So.2d 1102 (Miss. 1985), this Court stated:
We have often stated that where the testimony is in conflict, the jury is the sole judge of the weight and worth to be given that testimony. They may believe or disbelieve, accept or reject the utterance of any witness.
463 So.2d at 1103.
Eight (8) witnesses testified for the State, and six (6) witnesses testified for the defendant. Evidence favorable to the State reflects that on January 20, 1985, around 8:15 p.m., Johnny Jenkins, the deceased, his wife, Clara, and friends left the Jenkins house after watching the Super Bowl football game and went to Henrietta's Cafe, a/k/a The Washington Cafe, in Warren County; that George Harris, appellant, approached Johnny Jenkins about a Super Bowl bet to which Jenkins responded either with a denial that they had a bet, or with a claim that he had won the bet; that appellant pushed or hit Jenkins first; that a fight ensued and bystanders pulled the two men apart; that appellant pulled a knife and said, "I'll be back to get you" and ran out the door; that Jenkins, his wife and friends, decided to go to another cafe, i.e., Mr. K's, but it was closed, and they returned to Henrietta's Cafe and went inside; that later Jenkins and his friends went outside where appellant was encountered near the cafe steps; that appellant made the following threatening statements to Jenkins, "Johnny, I want your curl" or "I'm gonna mess your curl up if I don't get my $10.00," referring to Jenkins' hair; that Jenkins and friends left and were moving toward Jenkins' car parked beside the cafe when appellant said something to Jenkins as they were walking away; that Jenkins broke from the group, made a running jump through the air as if to kick appellant, that Jenkins did not have a gun or any weapon; that appellant shot three times with a .22-caliber pistol, two bullets hitting Jenkins in the chest and one in the abdomen, which resulted in Jenkins' death.
Some witnesses testified that appellant was walking behind Jenkins, taunting him; that appellant pointed the gun at Jenkins from the top of the cafe steps; that when appellant and Jenkins confronted each other outside, appellant said, "I'm gonna' get you;" that Jenkins ran toward appellant and "played like he was going to do a kick on him and hit him;" that appellant "just came out of his pocket and just aimed at Jenkins and started shootin';" and that appellant fired at least the first shot through his coat pocket.
In Gandy v. State, 373 So.2d 1042 (Miss. 1979), the Court said:
No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict.
373 So.2d at 1045.
In Jones v. State, 381 So.2d 983 (Miss. 1980), the Court commented on the jury's scope:
The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects or perception, memory and sincerity.
381 So.2d at 989.
The jury was thoroughly instructed on murder, self-defense, and manslaughter. Two strong instructions on manslaughter were granted at the request of the State, as well as a form of the verdict on manslaughter (S-2, S-5 and S-6). The court granted, at the request of the appellant, two strong instructions on self-defense (D-2 and D-4), a strong instruction on the *605 State's burden of proof (D-8), and a strong instruction on manslaughter (D-10).
We are of the opinion that the facts of this case presented a guilt issue of murder to the jury through proper instructions, and that the jury verdict of guilty is supported by the evidence.
HAWKINS, Presiding Justice, for the Court:

II.

THE LOWER COURT ERRED IN DENYING APPELLANT THE RIGHT TO A FAIR AND IMPARTIAL TRIAL BY LIMITING APPELLANT'S VOIR DIRE OF POTENTIAL TRIAL JURORS.
Harris next assigns as error that the court improperly sustained objections to questions he asked prospective jurors.
The following questions were allowed without objection by the State:
Ladies and gentlemen of the jury, if his Honor Judge Clements, at the conclusion of the trial, gives you an instruction on self defense and defines what the law of self defense is, can I rely on each and every one of you to read that instruction and to apply that instruction to the testimony and to the evidence in reaching your decision? Can I depend on you to do that? Will each of you do that? If the law tells you that you must acquit, if that be the circumstances, can you acquit the defendant of the charge in the indictment? And the word, "acquit" means, can you find him not guilty? Can you do that?
* * * * * *
Will any of you gentlemen or ladies ignore or put aside the defense of the defendant? And, we are asserting the defense of self defense, but will you consider that defense along with the other evidence and other testimony submitted by the state? Would you consider the defense? Will each of you do that?
(Vol. I, pp. 49-50)
The questions to which the court sustained the State's objections follow:
Now, ladies and gentlemen of the jury, if it is shown by the evidence, that the defendant was confronted with a situation that warranted the use of force in the protection of his well being, and that it was imminent that his life was in grave danger, and that he was justified in using the necessary force to repel his assailant, the deceased, can the defendant depend upon you to bring in a verdict of not guilty?
(Vol. I, p. 47)
Now, ladies and gentlemen of the jury, if it is shown by the evidence and by the testimony that the defendant had reasonable grounds to apprehend a design on the part of the deceased to do bodily harm, or to take the defendant's life, and the defendant tried in every way possible to avoid the confrontation, but the deceased was persistent in his attacks on defendant to do him bodily harm, thereby placing the defendant in grave danger of his life, and the defendant was justified in using only that force necessary to repel the defendant, can the defendant depend upon you to bring in a verdict of not guilty?
(Vol. I, p. 48)
Now ladies and gentlemen of the jury, if it is shown by the evidence, by the testimony, that the danger to the Defendant was actual, present, and urgent, and that the Defendant used no more force than was necessary to protect his well being; can the Defendant then depend on you to bring in a verdict of not guilty?
(Vol. I, p. 48)
If it is shown to you by the evidence, or if there arises from the evidence in this case, a reasonable doubt in your mind that the defendant did not intend to kill the deceased, but merely intended to protect his own life, can the defendant depend upon you to bring in a verdict of not guilty?
(Vol. I, p. 48)
The trial judge explained his rulings:
The Court is telling you that you cannot ask questions of fact couched in hypothetical terms of the law that have not been given to the jury at this point, because *606 it's not limiting the defendant's right in any manner to voir dire the jury as to whether or not they will follow the law as given to them by the Court at the conclusion of the trial as to self defense. The Court further would state for the record, that although the Court does not intend at this juncture, or any other juncture, to tell Counsel how to present his case or practice law, there are ways that questions can be asked to the jury to find out their feelings and their state of mind in the voir dire as to the defense of self defense, but they cannot, in the Court's opinion, be asked in the manner presented here in Chambers.
(Vol. I, p. 49)
A trial judge in questioning prospective jurors has the essential responsibility of selecting individuals who can impartially evaluate the evidence offered in court and apply the law given through court instructions to what they determine are the facts in the case.[1]
The parties' counsel each knows more about the facts of the case and his own client than does the trial judge. It is therefore perfectly proper for counsel to ask further questions beyond the court's inquiries reasonably necessary to assure himself and the court that the jurors selected will give his client the benefit of every right to which he is entitled under the law, as well as to reveal or signify particular antipathies that could prejudice his client before any proposed juror. Phenizee v. State, 180 Miss. 746, 178 So. 579 (1938).
All of this is in keeping with the trial objectives of selecting a jury which can even-handedly weigh the adduced evidence and fairly and rationally apply the law given by the court to what they find to be the facts. Governed by a wise and liberal discretion of an experienced trial judge, a wide latitude should be allowed counsel to gain knowledge of jurors' attitudes towards the issues to be tried, and also towards special matters which likely will come up in a trial which reasonably could unduly influence some of the jurors, or indicate bias or hostility. Counsel should also be permitted to ask questions which give some measure of the competency or capacity of jurors to decide the issues in the case. Such questions should be permitted not only to challenge prospective jurors for cause, but to give trial counsel clues from which they will exercise peremptory challenges. Murphy v. State, 246 So.2d 920, 921 (Miss. 1971); Atlanta Joint Terminals v. Knight, 98 Ga. App. 482, 106 S.E.2d 417 (1958).
This is the extent of the rights of litigants in the jury selection process. While it is no doubt true that most of the questions asked of prospective juries will be the same, repeatedly asked in hundreds of cases, the selection of a jury should by no means be purely by a rote or "boiler plate" inquiry by court or counsel. Because the line between a proper and improper question is not always easily drawn, it is manifestly a process in which the trial judge must be given a considerable discretion. Murphy, 246 So.2d at 922. And, while the trial judge should be lenient in seeing that these requirements are fulfilled, no court is required to permit trial tactics which go beyond them.
Many able trial attorneys attempt the apocryphal yet sage battle tactics of Nathan Bedford Forrest to "git thar fustest with the mostest." Subtly, and sometimes not so subtly, they attempt to get a leg up on the opposing side at the very first opportunity. Thus, in their voir dire questions they emphasize or reiterate points already made, as well as attempt to exact promises or pledges from the jury, and otherwise lead the jury to prejudge the case. A trial court is not required to, nor should it permit voir dire questions which go beyond the basic purposes of the jury selection process.
*607 This, in effect, is the meaning and objective of Rule 5.02 of the Uniform Criminal Rules of Circuit Court Practice:
Rule 5.02
VOIR DIRE
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.
Beginning with Phenizee v. State, supra, this Court has repeatedly admonished and condemned attempts in voir dire questioning to exact a promise or commitment from jurors on how they will decide a particular case. Williams v. State, No. DP-56 (Miss. Oct. 7, 1987); Stringer v. State, 500 So.2d 928, 938 (Miss. 1986); West v. State, 485 So.2d 681 (Miss. 1985); Murphy, supra; See also Baxter v. State, 254 Ga. 538, 331 S.E.2d 561 (1985). Bowens v. State, 116 Ga. App. 577, 158 S.E.2d 420 (1967); Palmer v. State, 532 P.2d 85 (Okla. 1975); Annot., 99 A.L.R.2d 7 (1965).[2]
Indeed, in Stringer, supra, we reversed because of an accumulation of several errors, including the error of permitting the prosecution over objection to ask questions seeking a commitment from the jurors. Questions such as these are never necessary to accomplish the basic purpose of securing fair and impartial juries.
Defense counsel in this case had no right to particularize what the facts would show and then ask the jurors if they would return a verdict of not guilty. The circuit judge properly sustained the State's objections to such questions.
The judgment of the lower court is affirmed.
AFFIRMED.
As to Part I: PRATHER, GRIFFIN, ZUCCARO and ANDERSON, JJ., concur.
HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON and SULLIVAN, JJ., dissent by separate written opinion.
As to Part II: ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
DAN M. LEE, P.J., dissents without written opinion.
HAWKINS, Presiding Justice, dissenting:
I can agree with the majority that the State survived, barely, the defense being entitled to a directed verdict on whether Harris was guilty of murder, but I am persuaded that the overwhelming weight of the evidence is that Harris was not guilty of murder, but at the very most manslaughter.
In my view this is a "classic" case, a textbook example, of the distinction between an accused being entitled to a directed verdict of acquittal and being entitled to a new trial on the basis of the verdict being against the overwhelming weight of the evidence. This distinction escapes the majority. In deference to the majority, it is my view that a grave injustice is being done in this case in not ordering a new trial on this issue.
If my recommended course were adopted, the State would at least have another opportunity to prove Harris guilty of murder. Harris is given no opportunity by the majority.

FACTS
On Sunday afternoon, January 20, 1985, the Miami Dolphins played the San Francisco Forty-niners in the Super Bowl. Watching the game on television in Vicksburg were the late Johnny Jenkins, age 24, his wife Clara, his cousin Melvin Wiggins, his *608 half-brothers Alvin Jenkins, Larry and Ronnie Porter, along with Julius Wooley, Freddie Butler, and others.
Johnny had made some wagers on the Dolphins. As anyone remotely familiar with national sports knows, he lost. Unfortunately for Johnny, his wife and two small children, he lost far more than his bets.
Wiggins had wagered on the Forty-niners and thereby won. The gathering (over Clara's objection  she wanted Johnny to stay home) decided to go somewhere for a celebration party with the winner of the bets getting the tab.
The group left in two vehicles. Their first stop was Washington Cafe, an establishment  as we view the several photographs furnished by the defense  that would not be famous for any culinary accomplishment. The parties also referred to it as "Henrietta's"; the proprietess was Mrs. Henrietta Ross. "Washington Cafe" or "Henrietta's," whichever it was called, was more accurately a recreational parlor, where there was at least one pool table, as well as a bar where refreshments were served. This business was located on a blacktop road nearby the Anderson-Tully mill in Vicksburg, and was either in or nearby a subdivision of low priced residences.
Larry Porter lived in a house next door to Henrietta's, and did not accompany the group into the restaurant. Instead, he went first to his house to change clothes. The remainder of the group in the two vehicles went into the cafe.
When they got inside, Johnny got Clara seated at the bar, and asked Henrietta (we will call her by her first name as did her customers) to change a twenty dollar bill, saying to himself as he did so, "I got to pay this guy."
Momentarily now, we leave the Jenkins party. Also that afternoon Robert Harris, age 21, his older brother George (the defendant), also called "Joe," age 24, Kenny Butler, Huey Younger and Michael King watched the game at Robert's residence.
George and Kenny Butler had wagered on the Forty-niners. After the game George, Butler and Younger also decided to go to Henrietta's. Robert Harris chose to remain home. Younger went in his own car. George and Butler were transported to Henrietta's by Jessie Davis in his car, where he let them out and left. Butler and George went inside.
At this point in time inside the cafe were Henrietta, Johnny, Clara, Wiggins, as well as George, Butler and Younger, all of whom testified  the first group (excluding Johnny) for the state, the others for the defense. There were others in the Jenkins party  Wooley, Freddie Butler, and Alvin Jenkins  who did not testify.
According to Butler, a defense witness, he reminded Johnny that he owed him five dollars from the game, and Johnny responded that he would pay him the following Thursday. At this particular moment there had been no trouble or problem of any kind. Then George asked Johnny to pay him his bet and Johnny denied ever making a bet with George. This was the genesis of the sequence of events resulting in the homicide.

STATE VERSION
First the version of the State witnesses. Wiggins, Johnny's cousin, testified that when George asked for his money, Johnny denied having made a bet with him and the two got into a scuffle. Bystanders separated them. Then, according to Wiggins, George walked around the end of the pool table and pulled a knife. And, when George pulled the knife, Johnny pulled out a pistol. The person then holding George turned him loose, and George ran out the door. Indeed, according to Wiggins, when Johnny pulled out his pistol not only George, but "everybody disappeared." Wiggins was positive Johnny pulled a pistol, affirming this several times on direct and cross-examination. He stated that when the fight started, Huey Younger jumped the bar and ran out the back door, "`Cause him and Johnny had been in two fights before."
Clara testified that just after she was seated at the bar George tapped Johnny on the shoulder and asked about his money. *609 Johnny laughed and inquired, "What money? I won the game." The two argued, and George hit Johnny and the two started fighting. When the two were separated, Clara testified Johnny got a pool stick and George pulled a knife. Her testimony does not make it clear whether George pulled the knife before Johnny got the pool stick or the reverse. In any event, she said George ran out the door, threatening as he did so to get Johnny.
Shortly thereafter Johnny and his group left Henrietta's for another Vicksburg establishment, "Mr. K's." Finding the latter closed, they returned to Henrietta's.
While some of the group were playing pool, somebody told Johnny that George was outside. Clara told him he was not going outside: "I ain't having no mess." The men continued the pool game, and Wiggins then suggested that they leave. Their destination is not revealed in the record.
Meanwhile, Larry Porter had changed clothes and was walking from his residence over to Henrietta's. As he approached the cafe, he met George, who he called "Joe Cool," and they mentioned a five dollar bet the two had on the game, with Larry losing. Larry paid George the five dollars. Larry was going into the cafe as the group emerged. He asked Johnny for a light. Johnny did not reply, but "just put the lighter and the gun in my pocket."
Continuing the State's version, Clara testified that as they came out George was standing off to the side of the steps and told Johnny: "I want your curl, and I'm gonna get it. I'm gonna get it if it's the last thing I do." Johnny replied that George was not "getting nothing" from him, and that he did not want to "hear that noise." The two were arguing as Johnny continued to the car, George insisting he was owed ten dollars and Johnny denying it. Larry and George then commenced arguing and Johnny pulled Larry away from George.
Robert Harris then came on the scene bragging about his fisticuff ability, and he and Larry started arguing. Clara and Johnny were almost to their car and Johnny went back to get Larry. She said they were arguing and Johnny's back was to her.
And, so him [Robert Harris] and Larry started arguing and Johnny said, "Come on, man," and, when Johnny told Larry to come on, this guy talking all then went to moving and this guy started rattling and the gun went off and I looked back, and I said, "Run, Johnny." I heard the gun, but I didn't know where it came from. [Emphasis added]
Clara testified she never saw Johnny pull a pistol in the cafe, and said he did not even own a gun, as far as she knew. She also testified that nothing kept Johnny from leaving. She said Johnny did not know George had a gun, that he (George) kept his hands in his pocket "all the time," and except for pulling his brother away, Johnny could have left.
Johnny was shot twice, once in the chest and once in the abdomen. Clara took him to the hospital, where he died.

Melvin Wiggins
Wiggins testified that when they returned from "Mr. K's" and were inside Henrietta's, somebody told Johnny that George was outside. Johnny took a look and came back.
Later, he said, they were leaving and when they got outside Larry Porter walked up and hit George. He said Johnny and George then got to arguing about the bet, George insisting Johnny owed him. Then, Huey Younger and Robert Harris came on the scene. Wiggins said he noticed a pistol stuck in Robert Harris' waist and warned him "not to do it," pulling his own knife at the time.
Wiggins said they then headed to the car. On direct examination he testified as follows:
And, at that time, more arguing going on, and I think we started back towards Johnny's car, and he said something, and Johnny ran at him and that's when he shot him... .
(R. 112)
He said George had his coat on and was standing with his hand in his pocket. Again:

*610 He [George] was standing there talking. We had started walking back towards the car and he said something and Johnny turned around and he ran and jumped in the air like he was gonna kick him, and that's when he shot him.
Wiggins said that George kept his hands in his pockets. Then, "Evidently he had said something and Johnny ran at him. (R. 140) He said, "When he jumped in the air a shot was fired." Again he testified that Johnny "jumped in the air like he was going to kick him in the chest." (R. 145)
He testified Johnny had nothing in his hand when he was shot.

Larry Porter
Continuing with Larry's version subsequent to his paying George the five dollar bet, and having received from Johnny (as he emerged from the cafe) a lighter and a pistol.
When Johnny's group got out onto the street, George told Johnny he wanted his money, and if he did not get it he was gonna mess up Johnny's curl. "I'm gonna get you if I don't get my ten dollars." The group got to arguing, and to stop George, Larry said he and Wiggins offered to pay him Johnny's bet. Larry even got angry enough at George to slap him. When he did George did not return the fight. Instead, he kept directing his questions to Johnny, arguing that he was owed money and telling Johnny if he did not pay him he was going to get him. Larry testified on direct examination:
So Johnny, after he said it the last time, I was at the top of the stairs, after he said it the last time, Johnny Jenkins broke and ran at him. When he broke and ran at him, he come at him, like, with a kick like, and that's when "Joe Cool" pulled the gun out and shot him three times.
Again on direct examination:
It took place on the street. It started like from the front of Huey's car, and he backed up, when Johnny ran at him, he backed up, stepped back. That may put him to the back of Johnny, to the back of Huey Younger's car, and Johnny half-way through the middle of his car, and that's when he fired like so.
On cross-examination Larry reaffirmed that Johnny had turned and run at George who shot at him as he leaped at George.

John Thomas
Thomas, a stepson of Henrietta's, who lived in her house behind the cafe, was an ex-convict. Thomas testified that as he approached Henrietta's he saw two people leaving: Huey Younger and George. He said Younger went through their backyard, and George down the street. Going into the cafe, he met Wiggins, who told him there had been a fight, and he did not go inside. Instead, he and Wiggins sat in Johnny's car. Shortly, Johnny and his group came out and left. Thomas did not accompany them.
About 20 minutes later, when Thomas was sitting in his front yard, the Jenkins party returned to Henrietta's. At that time he went inside with them.
They were drinking beer when he saw Johnny go to the door. Clara told Johnny it was time for them to go, and Johnny got his beer and they went outside. Thomas went outside with them to tease Johnny about the game. George, Robert Harris and Huey Younger were standing by a car. Thomas heard George mumbling, "I'm gonna getcha." He told Johnny to leave it alone. He further testified:
And so at the time then, Johnny said, "Naw, naw." If you're gonna get me, why don't you get me now, then?" Just like that. His brother Larry, Larry [sic] said, "If you're gonna get them, why don'tcha get em now?" Then, when Johnny walked over to em, and George Harris was steady talking, so Johnny did like (shows movement Johnny made) you know, like he was gonna grab George Harris or something, and that's when he shot him.
(R. 193)
Thomas testified that he was about 30 or 35 feet away from Johnny when he got shot, and he recognized George's voice. He did not see any pistol. He heard the shots. He and Wiggins were walking away when the shots were fired.
One question and answer follows:

*611 Q. You heard him say, "I'm gonna getcha" and then you say Johnny threw his arms up and said, "If you're gonna get me, get me now?" Is that what he did?
A. He didn't just throw his arms out like "Hey shoot me now." He said, "Get me now," like he was gonna grab him. Like he wanted to fight the man or something.
(R. 219)

Ronnie Porter
Ronnie, Larry's brother, testified he arrived by himself at Henrietta's around 7:30. He said he did not see George. Yet, when asked if there had been a fight before he got there, he replied, "Naw."
After he got there the group went to "Mr. K's" and returned. They had a couple of beers and somebody told them "Joe Cool" was outside. He identified "Joe Cool" as "that cat right there," meaning the defendant.
Johnny's group went outside. Ronnie testified:
A. Joe Cool. Standing outside, looking up in the air, with his hands in his pocket. So, uh, we just walked, a couple of us just walked up to him and said, uh, they was fixing to pay him off what Johnny had owed him, and after that, my brother came next, from the house, next door to Henrietta's, he was outside and he came up talking to him. They were talking like friends and stuff. Somebody told my brother that Joe Cool had hit, him and Johnny had been fighting and he had did something to Johnny, so my brother hauled off and hit him.
Q. Hit who?
A. Joe Cool.
Q. What did Joe Cool do?
A. He didn't do nothing.
Q. Where were his hands at the time?
A. In his pockets.
(R. 228)
* * * * * *
Q. Where was Johnny?
A. Well, Johnny, he was going toward, going back in Henrietta's. I guess the reason Joe Cool had [said] something to Johnny and Johnny just ran toward him and said, played like he was gonna do a drop kick on him and hit him. And then, I reckon just back on up, and Joe Cool, he just came out of his pocket, and aimed at Johnny and started shooting.
(R. 213)
On cross-examination Ronnie was asked about his demonstration of Johnny's movement towards George.
Q. Okay. When you demonstrated for the jury a minute ago how he took about three steps and kind of kicked his leg, was it his right leg that he kicked up?
A. I can't tell you that. It was one of them. He just faked a kick.
Q. And the he also threw a fist.
A. Right.
Henrietta also testified for the State. She recalled George pushing Johnny first and an ensuing scuffle. She thought they were playing. She went back in a storage room and when she returned, there was a huddle and a gun. She never saw a knife.
I couldn't see who had the gun in their hand because all I did was see the gun and the gun was wavin' and going on and I saw it and I just scooted out the back door and stuck my head back in... .
She also testified that when Johnny's group returned, Johnny would go in and out of the cafe every few minutes.
She estimated about 45 minutes lapsed from the first trouble in her cafe until the shooting. The next day she was told the shooting occurred in the street almost a block from her place of business.
The State also introduced into evidence the transcribed statement George had given to the law enforcement officers on January 21.
No State witness testified George made any physical movement at or towards Johnny at any time outside the cafe prior to Johnny's running and kicking at him. *612 Even George's verbal threats were provoked by Johnny's failure to pay his bet.

THE DEFENSE
Kenny Butler called George "Joey." (We are back in the cafe now, and Kenny has just been told by Johnny that he will pay his five dollar bet next Thursday.)
Butler was turned away from Johnny and heard a "struggle." He turned and saw it was between Johnny and Joey. He grabbed at one of the two of them and fell to the floor. Several others present also attempted to separate them.
As Butler was getting up he saw a pistol in Johnny's waist "down side his pants." Johnny pulled the pistol and Butler got out of his way.
George backed around the pool table up against a post. Johnny put the pistol "up side his head." Then Clara called out, "No, don't do that." She went over and hit Johnny's hand and the pistol fell to the floor. George ran out the front door. Butler never saw George with a knife.
Butler further testified that when George ran out, Johnny, Clara and Melvin also went out into the street. He went to the back of Henrietta's house, and Huey Younger also came back where he was. He could see Johnny out in the street with his pistol, waving it around, and "saying to somebody," "Where you et [sic], where you et, where you et?" He also heard Johnny say that he would be back the next night and shoot the first one who stepped in the door. It was Butler's opinion that Johnny had either a .25 or .22 caliber revolver.

Huey Younger
Younger and Butler are cousins. According to Younger, he and Johnny had engaged in a fight about three months before, in which Wiggins and Larry assisted Johnny (if such assistance was necessary), and he had received a good whipping, even losing a tooth. The dental gap was exhibited to the jury. He denied striking Johnny at any time when he and George were scuffling in the cafe, and denied being angry at Johnny for the beating he had got. "I wasn't mad about it then. I just did not mess around with him, period."
While they were at Robert Harris' residence that afternoon after the game, George and some others left. George said he was going around to Washington Cafe and collect some money that he had won. Younger remained momentarily with Robert and then drove his car to Henrietta's.
When he got inside he saw George and Johnny arguing. George shoved Johnny, and "that's when they went to fighting. Younger said he backed out of the way because he did not want anything to do with the fight. He also testified that during the scuffle Johnny pulled out a gun, which he thought was a .25 automatic, and then Johnny was running George around the pool table. He said Johnny ran him around the pool table about twice, and George got to "a corner like at the bar." He said Johnny had the gun to George's head and told him he would blow his brains out. He said that Wiggins and Clara came over and told Johnny not to do that. Clara's arm hit Johnny's arm, the pistol hit the floor, and George ran out the door. Younger testified George was not armed.
Except for Younger, Henrietta and someone else behind the bar, everyone in the cafe went outside. When they were outside, Younger heard Johnny yelling, "Where that dam [sic] Huey at? I'll blow his dam brains out." Expediency then dictated Younger's hasty departure out the back door of Henrietta's. He ran to the back of Henrietta's house and heard Johnny yelling, "Where they et [sic]? Whey they et?" and saying he was going to kill them.
Younger found Butler at the rear of Henrietta's house as well. Butler told him he had better go on home. While driving his car to go home, Younger saw George around the block, standing in the road.
Younger then drove to Robert Harris' residence and told him about Johnny's putting a gun to George's head. Robert put his clothes on and Younger drove him back to the cafe.
When they arrived he estimated there were fifteen or twenty people in the street. *613 Younger stopped his car and Robert got out. He then saw Robert and George retreating. They walked past his car and he left. He never saw Johnny.

Robert Harris
At the time of trial in March, 1986, Robert was 21. He testified Younger returned to his house about fifteen minutes after everybody had left, and told him George had got "to fighting down in the subdivision. He said come on and get him." (R. 386) Robert dressed and Younger drove him to the scene. When they got to Ford Street in the subdivision, Younger stopped his car in front of an aluminum fence about three houses down the road from the cafe and let Robert out. Robert then went down the street to where George was. He said there was a crowd of people, of whom he could identify Johnny, Clara, Wiggins, Larry and Ronnie, Alvin Jenkins and Freddie Porter.
He said George was standing in the middle of the road, circled by the crowd. Johnny and George were talking. Johnny was threatening, "I oughta kill you." He said this occurred down the road from the cafe.
Robert told George to come on and go home. George said nothing, but "just looked at me." Both of them were surrounded. Robert went to a car. Then he saw Larry Porter slap George. Robert went back into the crowd, and Larry asked him why he was there. He then headed back to the car and, as he was backed up against the car, Larry, Ronnie and Wiggins surrounded him. Johnny then came up to him, put a gun in his face and asked him what he wanted to do. He told Johnny all he wanted to do was get his brother. He then went to the back of the car and all the way around it and then out into the street and told George to "come on, let's go." George then started backing down the street accompanied by Robert, who was facing the direction in which they were walking. The crowd thinned and let them through. The two of them backed up to where Younger was parked, and Younger drove off. Robert could hear Johnny's brothers telling him, "Go on waste him, man. Whatcha waiting on? He ain't nothing. Go on waste him."
He saw Johnny come around a car with his hand in his pocket.
I don't know what happened to the gun. All I know is he had his hand in his pocket and we was going backwards they were following us, they were following us. Okay. So, I turned around and I was headed forwards 'cause I wanted to see who was behind both of us and my brother was still backing up.
(R. 394)
They had moved away from the cafe down to a TransAm automobile, and when he turned around he saw George backed up against the car, the crowd again surrounding him.
He saw Johnny and George face-to-face. He testified:
A. So when I turned around I heard somebody holler somebody holler out loud, and I turned around, and when I turned around the fellow, Johnny Jenkins, was standing straight up, they were face to face. They were face to face. And then all of a sudden Johnny Jenkins just took and turned around and just walked off. He just walked off.
Q. Which way? In what direction was he walking?
A. He just turned around and walked back towards the cafe. He walked back towards the cafe and when he was walking back towards the cafe I say he went about three or four or five steps, and then he just turned back around all of a sudden and ran at jumped up and kicked my brother.
Q. What, if anything, did Johnny Jenkins have in his hand at this time?
A. Well, really, okay, I didn't really see nothing but a flash. I didn't really see nothing. I just seed [sic] a flash. I didn't see nothing but a flash.
Q. Did you see a gun in Johnny Jenkin's hand at this time?
A. Well I don't know whether it was a gun or not. I just seed [sic] a bright *614 flash. Something shining. I don't know exactly what it was. I don't know what it was.
Q. Can you swear that you saw a gun in Johnny Jenkins hands at this time?
A. At this time?
Q. Could you swear it?
A. Nope, I couldn't swear to it.
Q. But you did see Johnny Jenkins come at George . ..
A. Yeah, I seed [sic] him coming. He ran and jumped and kicked him.
Q. What did George Harris do?
A. Well, okay, like ... after he ran and jumped and kicked him, okay. I say like after he kicked him my brother fell up against the car, and after he fell back up against the car, okay, I say about the time the fellow kicked him got straight, half-way straightened up, like catching his balance, okay, when he got half-way straightened up from catching his balance, I heard the shots.
Q. Do you know where the shots came from?
A. I don't know where they come [sic] from.
Q. Did you see any guns?
A. I didn't see no gun, period. Not at that time.
(R. 395-396)
As Robert was leaving after the shots, he saw George running past him. Robert went on home. About fifteen minutes later George came to his house. He did not know George had shot anybody. It was after they were arrested that George told Robert about shooting Jenkins.

Willie Brown
Brown, like Thomas, was no stranger to Parchman. He, too, was on his way to Henrietta's. As he was walking he saw the gathering in the street which he estimated to be ten to twelve people. He said they were in front of George, whom he barely knew. George was backing up. In front of George was a "tall young man with something shiny in his hand like a pistol." (R. 419) George was saying, "I don't want no trouble, because trouble's easy to get into." "I know that we've had a little misunderstanding about a bet." (R. 420) "... and in the background the echo was saying `waste him, man, waste him. Go on, waste him.'" The crowd was down the street from the cafe. Brown continued:
A. Well, he, the man he was backing up. He was walking forward just like this with the gun. Then all of a sudden the man with the gun stopped and he turned around quickly and then he ran and he jumped up and he kicked him. It was a Trans-Am sitting on the right hand side of the road which I was headed, and when he kicked this young man here, he fell upside the car. And, when the man that did the kicking landed back on his feet, shots come out. Two shots.
(R. 420)
Following the firing of the shots, everybody scattered.
James Sterks was also walking along Ford Street that night and saw the trouble, but was unable to identify any of the parties.

George Harris
George Harris's testimony was essentially the same as the version he gave in his statement to the law enforcement officers. He was 24, and had been employed at Anderson-Tully for four years.
He reminded Johnny that he owed him a bet, and Johnny denied owing him anything. They were arguing and Johnny slapped him. He grabbed Johnny. When they were pulled apart, he ran around the pool table. Johnny came around to him, put a pistol beside his head, and led him around to a post, where he could go no further. Wiggins and, he believed, Clara knocked the gun out of Johnny's hand.
George seized the opportunity to run out into the street. He went up the street near a car. He saw Johnny come out of the cafe. He did not run, saying he was afraid Johnny would shoot at him. He ducked under a car. He heard the crowd hollering *615 and talking, and then they left. He got out from under the car. While he was standing in the street he saw Johnny's car return, and back he went under the car.
He saw Johnny's group go back into the cafe. He said that he was not ready to go because he had to collect some more bets. "Some more guys was supposed to come around and pay me." (R. 467) On the other hand, he did not want to go back into the cafe.
Larry Porter walked up; he reminded him of the bet, and Larry paid him. The two shook hands.
Then Johnny came back out of the cafe, and told Larry that he (George) had "slapped him, or something." Larry and Johnny then started doing a lot of talking. George said nothing. "After that, he [Larry] just hauled off and popped me." (R. 467) Larry was attempting to make him fight. A crowd circled him, and Johnny dared him to run, saying if he did he would shoot him in the back.
Robert arrived and the crowd circled him, also. Johnny threatened Robert with the gun, but left Robert alone and came over to George with the gun. Johnny backed him up to Younger's car, and Johnny told Younger, "I oughta kill you." Younger "just mashed on his car and went on around the street."
As he and Robert were backing up the street, Freddie Porter, the father of Johnny and the Porter boys, told George and Robert to "just go ahead on, cause I can't tell them nothing." So he and Robert kept retreating. They had almost reached a stop sign. The crowd turned back to the dave. George guessed the crowd had cooled off.
He continued:
Anyway, after that, all the rest of 'em was going back, Clara was going back and they headed Johnny, and he just broke loose from the crowd and ran and jumped and kicked me against this car and put his gun right there.
Q. And what did you do?
A. I was, I didn't know, I just got ... I just shot.
(R. 470)
George had a .22 caliber pistol in his pocket. He did not know how many bullets were in it. He was not sure how many times he fired. He said when he shot, Johnny was "right up on me... . We was skin to skin." All the shots he fired were fired before Johnny broke and ran.
Q. Where did you go ...?
A. I ran up the street, 'cause see it was so many of them I wasn't gonna go straight up the street, so I cut around through these little bushes, you know, down around Miss Henrietta's so they would not catch me. I went around through there. And, uh, I went through there and I had, uh, I say it to myself, I say, "Ah, man I think I shot that guy," and it depressed me. I don't know did I shoot him or not at that present time. I say, I think I had shot him, so I went through these bushes then, nervous like I was and everything. I took the gun and I threw it away and I went on.
(R. 472)
He went to Robert's house and it was there that the law enforcement officers arrested him. George said he shot Johnny to keep Johnny from killing him. He said that he had the pistol in his possession all day, in his right jacket pocket.

LAW

EVIDENCE SUPPORTING MURDER CONVICTION
At the conclusion of all trial testimony, counsel for George Harris moved the court to find the crime of murder had not been proved, and to reduce the charge from murder to manslaughter. The circuit judge overruled this motion and by technically proper instructions submitted to the jury the questions of whether Harris was guilty of murder, or of manslaughter, or was not guilty because he acted in lawful self defense. Harris does not argue on appeal that a jury issue was not made of whether *616 he in fact shot Jenkins in necessary self defense, but he does claim that at the most the proof made only a jury issue on manslaughter.
In overruling the motion to submit only a manslaughter instruction to the jury, the circuit judge acknowledged this was an extremely close case.
It is well settled that this Court will not disturb a jury verdict based upon conflicting evidence. Gill v. State, 485 So.2d 1047, 1049 (Miss. 1986); Shannon v. State, 321 So.2d 1, 2 (Miss. 1975). Equally well settled is the rule that the jury is the sole judge of the weight and sufficiency of the evidence, the credibility of the witnesses, and may accept or reject all or any part of any witness's testimony. Watson v. State, 465 So.2d 1025, 1030 (Miss. 1985); Williams v. State, 427 So.2d 100 (Miss. 1983); Young v. State, 425 So.2d 1022 (Miss. 1983); Grooms v. State, 357 So.2d 292, 295 (Miss. 1978); Woodward v. State, 180 Miss. 571, 178 So. 469 (1938).
Under Rule 607, Mississippi Rules of Evidence, adopted January 1, 1986, the so-called voucher rule has been abolished. This case was tried prior to the adoption of these Rules. Aside from the voucher rule, however, this Court has held that the State was not impeaching its own witnesses' testimony by offering other witnesses who testified to the contrary on material facts. Maddox v. State, 230 Miss. 529, 93 So.2d 649 (1957); Manning v. State, 188 Miss. 393, 195 So. 319 (1940).
This being said, I am compelled to conclude that the proof was overwhelming that at the most, George was guilty of no crime greater than manslaughter. Jordan v. State, 248 Miss. 703, 160 So.2d 926 (1964).
While the deliberate design to kill in order to justify a conviction of murder may be formed in a very short time, Windham v. State, 520 So.2d 123 (Miss. 1987); Goldsby v. State, 226 Miss. 1, 78 So.2d 762 (1955); Johnson v. State, 140 Miss. 889, 105 So. 742 (1925). See also U.S. v. Shaw, 701 F.2d 367 (5th Cir.1983), it must exist in the mind of the slayer when he acts. The proof is uncontradicted that George, even though armed outside the cafe, made no movement whatever to harm Johnny. The two had a running argument outside the cafe, and there was ample time and opportunity for George  had he been so inclined at the time  to shoot Johnny. Indeed, Larry slapped or struck Harris, and he did nothing.
It is clear he evidenced no intent whatever to physically harm Johnny until Johnny turned and charged, and either kicked or tried to kick him. Johnny's cousin Melvin Wiggins, and his half-brothers Larry and Ronnie Porter testified Johnny was attacking George before he did anything. All these were State's witnesses.
It is clear George made no attempt to harm anyone until Johnny made a physical attack upon him. While there was some dispute as to whether Johnny at that moment of attack was armed with the pistol, the proof is overwhelming that George had every reason to believe and expect he was still armed  with the same pistol Johnny had threatened him with less than an hour earlier.
It is undisputed that Johnny was making a physical attack on George when the latter fired, and the proof is almost as strong that Johnny had threatened George with a pistol inside the cafe. Wiggins, a State witness and Johnny's own cousin, so testified. Larry Porter, Johnny's half-brother, and another State witness, testified Johnny put a pistol in his pocket when he came out the door of the cafe. These two witnesses' testimony was positive. There could be no mistake about their testimony as to Johnny's pistol. Unless they  State witnesses and close kin to Johnny  were committing perjury, Johnny had a pistol in the cafe. Their testimony agreed with the defense testimony of Butler, Younger and George himself. Henrietta, another State witness, saw a pistol in use. She did not know whose it was, but there is no testimony that anybody other than Johnny brandished a pistol inside the cafe.
In Anderson v. State, 199 Miss. 885, 25 So.2d 474 (1946), a case in which the accused and one Vera Evans had just engaged *617 in a quarrel, and the accused was walking past her, we said:
[I]f it can be said that his first inquiry to her was the act of an aggressor, it is undisputed that on his way to get the mail he had passed Vera and was going on his way; that nothing was said between them when he passed her, and that after he had gotten beyond her, she began the verbal encounter again; that she herself renewed the contest after he had abandoned it; that she had in her possession a hoe and drew it upon appellant. In other words, there is no question that this was a mutual fight and combat, and was immediately brought on by Vera herself. There seems no question the act of appellant was committed in the heat of passion. Whether appellant acted in self-defense and was justified in his actions were questions for the jury, but the undisputed proof discloses a situation where appellant could not be guilty of an offense greater than manslaughter.
199 Miss. at 895, 25 So.2d at 477.
I have tediously set forth all relevant evidence upon the issues, and as noted, the record is undisputed that George had not attempted to impede Johnny in any way from going to his car and had made no movement whatever to harm Johnny, when Johnny physically attacked him.
The only testimony that Johnny did not have a pistol inside the cafe was Johnny's wife Clara. Younger, Butler and George, and the State witnesses Wiggins, Henrietta and Larry, testified to the contrary. While Clara's testimony enabled the State to barely escape a directed verdict on the issue of murder, Barker v. State, 463 So.2d 1080, 1082 (Miss. 1985); Justice v. State, 170 Miss. 96, 98, 154 So. 265 (1934) it cannot survive the test of being manifestly against the overwhelming weight of the credible evidence. Landers v. State, 304 So.2d 641 (Miss. 1974); Marr v. State, 248 Miss. 281, 288-89, 159 So.2d 167 (1963).
I would remand for another jury to pass on the question of whether George was guilty of murder, or whether at most it was manslaughter, or whether he acted in necessary self-defense.
DAN M. LEE, P.J., and ROBERTSON and SULLIVAN, JJ., join this opinion.
NOTES
[1] For example, no prospective juror would have the ability to base his decision solely upon the evidence offered in court if he were an eyewitness to the event.

Nor would a prospective juror have an ability to impartially evaluate the case if he had such entrenched feelings about the subject matter of the case that he could not follow the law given by the court.
[2] In Phenizee v. State the error was egregious because the prosecution attempted to get a jury commitment to return a death penalty sentence, when the law of this State gave the jury the sole and absolute discretionary authority to sentence the accused either to death or life imprisonment.